**James B. JOHNSON et al., Appellants,**

**v.**

**Woodrow POTTER et al., Appellees.**

Court of Appeals of Kentucky.

June 21, 1968.

As Modified on Denial of Rehearing
Nov. 15, 1968.

O. T. Hinton, Pikeville, for appellants.

Henry D. Stratton, V. R. Bentley, Ronald W. May, Pikeville, James Park, Jr., Lexington, for appellees.

PALMORE, Judge.

The appellants, hereinafter called the Johnsons, leased a tract of land and right-of-way from Curtis Potter and wife, Corbie Potter, for the purpose of quarrying limestone. The term of the lease ran from 1949 to 1964 with a 10-year renewal option. In 1961, twelve years later, the appellees, whom we shall call the Richard Potter heirs,[1] brought this suit to quiet their title to a 30-acre tract on which the Johnsons had constructed a haul road and installed substantial equipment. The Johnsons appeal from a judgment declaring title to be in the Richard Potter heirs but permitting the Johnsons to continue using the haulway and maintaining their installations on the property for the duration of the lease from Curtis and Corbie Potter.

It is conceded that the property in question is not included in the description contained in the lease, though both the Johnsons and the Curtis Potters thought it was until it appeared otherwise during the progress of this litigation. The misunderstanding arose in the following manner:

Richard Potter and his wife, Winnie Potter, both of whom died in 1935, had made conveyances of land to all of their children except A. J. Potter, a son. In 1938 A. J. Potter filed suit in the Pike Circuit Court against the other children and heirs of Richard Potter (who died intestate) alleging that these conveyances were advancements, and that when his father died he still owned one tract of land, which was of

---

1. Actually, some of the Richard Potter heirs were plaintiffs and the others (including the lessor Curtis Potter) were made defendants. However, none of the latter defendants appealed. The only defendants to appeal were the Johnsons, the leaseholders.

less value than each of the tracts theretofore conveyed to the other children, and which he had intended to convey to A. J. Potter. He alleged also that Richard Potter left no other property, real or personal, and that by reason of the advancements made to the other children he, A. J. Potter, was entitled to this one remaining parcel. In due course a judgment was entered to the effect that A. J. Potter was the owner of the property. The description of the property as set forth in A. J. Potter's petition (complaint) and in the judgment is the same description contained in the subsequent lease from Curtis and Corbie Potter to the Johnsons.

The fact is that at the time of his death Richard Potter also owned the 30-acre tract that is the subject of this litigation. It lies at the entrance of Mountain Branch into Elkhorn Creek at the foot of Cumberland Mountain, whereas the tract described in the A. J. Potter judgment is on top of the mountain near the head of Mountain Branch. The two tracts are separated by a larger tract conveyed by Richard Potter and wife to Toy Potter, another of their sons, in 1923.

Curtis Potter is one of the children of A. J. Potter. Following the death of A. J. Potter his widow and other children conveyed the tract described in the judgment to Curtis and his wife, Corbie. Curtis and Corbie were divorced some time after they had leased it to the Johnsons, and the Johnsons purchased Corbie's undivided half interest during the pendency of this action.

The Johnsons make two contentions, (1) that the Richard Potter heirs have not sustained the burden of proving their ownership of the 30 acres, and (2) that if the Richard Potter heirs do own the property, the Johnsons nevertheless have acquired an easement by estoppel.[2]

At the beginning of the evidentiary hearing the parties stipulated as follows: "There is no issue as to preceding title to the property as the parties claim as successors to Richard Potter and Winnie Potter." In other words, they stipulated that they were claiming under a common source of title. It is conceded that Richard Potter owned the property at his death, so if it did not pass to A. J. Potter under the judgment in the 1938 proceeding it still belongs to his heirs. Though it is true that a party asserting ownership of real estate must prevail on the strength of his own title rather than the weakness of his adversary's claim, under the circumstances of this case the title of the Richard Potter heirs is established by the stipulation unless it is shown to have gone to A. J. Potter in the 1938 suit.

The Johnsons argue that the purpose and intent of the judgment in the 1938 suit were to give A. J. Potter all that remained of the Richard Potter estate, and to divest the other heirs of any interest in it. They say the judgment made that determination and is *res judicata*.

We have examined the entire record and transcript of evidence in the 1938 proceeding, all of which was incorporated as a part of the record in this case. It is clear from the testimony that the "tract" owned by Richard Potter at his death was not one tract, but consisted of two pieces of land, one on top of the mountain above the cliff and the other on Elkhorn Creek. For example, we quote from various witnesses as follows:

*A. J. Potter* (plaintiff)

Q- "How many acres is there in the tract described in your petition?"

A- "I imagine there's 200 acres. I judge in the lower part 25 acres, maybe more and maybe not that much. Then there's something like 200

2. It was stipulated "that the roadway and part of the improvements on the tract of land in controversy were made within

view of the residence of one of the Plaintiffs and with his knowledge."

acres of the mountain. I don't know that there's that much."

\* \* \* \* \*

Q- "Now this 25 acres in the lower tract there, it lays down next to Elkhorn Creek?"

A- "Yes, sir."

\* \* \* \* \*

Q- "Andy, talking about this tract of land your father owned at the time of his death, I believe you say there's about 25 acres that lays down on the creek below the limestone cliff and the rest lays above that cliff?"

A- "Yes sir, that's right."

\* \* \* \* \*

Q- "The only thing of any value is this 25 acres that lays off down on the creek?"

A- "Yes sir, and some of it has been cleared up for 50 years."

Q- "Tell the court whether or not these other tracts lay along Elkhorn Creek on the public highway?"

A- "All except Toy's and his joins this 25 acres."

\* \* \* \* \* \*

Q- "Does any of the land he conveyed to the other children lay above the limestone cliff?"

A- "No sir."

Q- "That is just a piece your father owned that he never deeded away?"

(Objection by Attorney L. J. May.)

A- "Yes sir."

\* \* \* \* \*

Q- "How high is it above Elkhorn Creek?"

A- "Something like three-quarters of a mile."

*Logan Wallace* (nephew of Richard Potter)

Q- "What about the piece that Mr. Richard Potter died the owner of that isn't deeded and in question here?"

A- "He died the owner of the piece across the creek and a strip in the mountain."

Q- "Speaking of that across the creek, how much is there of it?"

A- "I guess there's about 25 acres of it; it's worth about $600."

Q- "What about the piece above the limestone cliff?"

A- "I don't know so much about the piece above that. I don't know how much there is of it; it's of very little value anyway."

*Brack Wallace* (another nephew of the Richard Potters)

Q- "Are you acquainted with the piece Mr. Potter died the owner of?"

A- "Yes sir, that piece across the creek. I guess I've tended every inch of it."

Q- "About what is that worth?"

A- "I guess about $600."

Q- "Are you acquainted with the piece that lays above the limestone cliff?"

A- "Never on it much, just to go through it."

*B. L. C. Francisco* (old resident of the neighborhood)

Q- "Uncle Bev, I believe it's about 35 or 40 acres down where there's an orchard that he died the owner of and not deeded?"

A- "Yes sir, I know where it is."

Q- "You know the land back on the mountain?"

A- "The piece he died the owner of, *it was cut in two by the deed he made Tolby* [sic]. I guess there's 35 acres

of the piece underneath; then the next was on top of the mountain. [Emphasis added.]

Q- "About 35 or 40 acres down there next to Elkhorn Creek and cut off by Toy's. About how much is in the tract he deeded Toy?"

A- "Not as much in that."

\*     \*     \*     \*     \*

Q- "Then there's something like 200 acres up in the mountain there, isn't there?"

A- "No, he deeded that off to Toy, *except the top of the mountain and this piece underneath.* [Emphasis added.]

In addition, for whatever it may be worth, there was filed as an exhibit with the testimony of one of the defendants a letter from A. J. Potter dated just prior to the commencement of the 1938 suit and addressed "To the Heirs of Dick and Winie Potter. to My Brothers and Sisters." It advises them that he has had a deed prepared "For the Field Across The Creek running up the Mountain Branch with Toy Potter. Line and down the Mill Hollow. which is about 25 acers So i want to know if you all are willing to Sign it \* \*. and if all is not willing i have my suit ready to file," etc.

It thus appears reasonably certain from the evidence in the 1938 proceeding that A. J. Potter thought, and so did the other parties to the suit, that the action covered the tract at the mouth of Mountain Branch which is in litigation here. It is clear also from the same evidence that as between this tract and the piece at the top of the mountain, this was the more valuable.

The judgment in the 1938 proceeding determines in substance that each of the children of Richard and Winnie Potter except for A. J. Potter and Toy Potter had received an advancement of greater value than the "tract" owned by Richard Potter at his death, which was worth $800; "that

there are no other assets belonging to said estate, except said tract of land," hence those children who had received such advancements "are \* \* \* not entitled to participate in a distribution of the remainder [of] their father's estate;" that Toy Potter had received an advancement of the value of $600; that A. J. Potter had not received an advancement, but owed his father's estate $250; and that the undistributed estate therefore amounted to $1050, of which A. J. Potter was entitled to $800 and Toy Potter $250. The judgment ends by describing the property as it was described in the petition, embracing only the piece on top of the mountain. The judgment does not decree a conveyance or declare the title to be in A. J. Potter. Later, however, an "Agreed Judgment" was entered, signed by counsel for A. J. and Toy Potter and endorsed by the circuit judge, under which A. J. agreed to pay Toy $250 and A. J. was adjudged to be the owner of the property, which was again described as in the petition and judgment.

We have laid out the details of this case to the point of tedium for the reason that it would be all too easy, through oversimplification, to reach an inequitable and unjust result. On the face of the pleadings and judgment in the 1938 case there is no ambiguity or uncertainty, and one might be tempted just to leave it at that and hold that the litigation did not pertain to or affect the property here in question. But the truth is that it did. There is a latent anomaly in the findings of the judgment to the effect that Richard Potter left no other property and its designation of the tract on the mountain as all that he did leave. It might also be argued that the judgment had to follow the pleadings, and this was all that was described in the petition. On the other hand, the petition was directed to the disposition of Richard Potter's estate, and a settlement of the rights of his respective children, and it concluded with a prayer for "all proper relief." We think it would have been proper, as among the heirs, for the court to adjudge that A. J. Potter was en-

titled to all of the remaining real estate of Richard Potter on the Mountain Creek watershed without specifically describing it, or, in accordance with the evidence, to include the creekside tract by mere reference to it. In short, we believe the failure to describe this tract in the petition would not prevent its inclusion in the judgment, though it would have been better to require an appropriate amendment of the pleadings.

"Extraneous evidence, in the absence of any better means of proof, may be admissible to show what was embraced by the judgment and to aid the record." Turner v. Begley, 239 Ky. 281, 39 S.W.2d 504, 506 (1931). "A court's judgment must be read and interpreted in the light of what was before it * * *" Hays v. Madison County, 274 Ky. 116, 118 S.W.2d 197, 199 (1938). "In construing the provisions of a judgment the usual canons of construction should be applied * * * It is always proper to consider what the judgment should have been, since it will be 'presumed that the court intended to adjudge correctly in law upon the facts of the case,' * * *. In case of doubt concerning the signification of the judgment, or of any part thereof, the whole record may be examined for the purpose of removing the doubt. One part of the judgment may be modified or explained by another part; and uncertainties in the judgment may become certain under the light cast upon them by the pleadings or other parts of the record. This is well illustrated in those cases in which the description of property in the judgment is supplemented and made certain in this manner." Freeman on Judgments, §§ 76, 77 (Vol. 1, pp. 132–135).

■■■ We have no doubt from the record of the 1938 case that the intent of the judgment was to vest in A. J. Potter title to both pieces of land mentioned in the evidence and there referred to and treated as a "tract." It is an ancient but enduring principle that equity regards as done that which ought to have been done. If in this case the plaintiffs were innocent buyers who had purchased the creekside tract, or an interest in it, from some or all of the Richard Potter heirs without notice of the 1938 proceeding except for the judgment, the intervening equities probably would require a different result. But that is not the case. The Richard Potter heirs stand in the same position now as they did in the 1938 suit. There is no reason why that which was intended and ought to have been done then should not now be considered as having been done. We hold that as between and among the Richard Potter heirs the effect of the judgment was to pass the title to A. J. Potter. Hence the matter has been adjudicated and the plaintiffs have failed to establish their title in this case.

Our conclusion is fortified by the circumstance that for twelve years one or more of the Richard Potter heirs who now claim ownership of the property stood silently by and saw the Johnsons use it and put $100,000 worth of improvements on it. The reason, of course, is apparent. They thought Curtis and Corbie Potter owned it and had the right to lease it until someone perused the record and discovered the inadequacy of the description.

The result we have reached obviates discussion of the estoppel argument.

Only the Johnsons have appealed. Insofar as the judgment grants relief against them it must be reversed. The effect of such reversal on the judgment as it affects the rights of Curtis Potter, who did not appeal, is a question we do not reach and upon which we express no opinion. It must first be determined by the trial court.

The judgment is reversed with directions that a new judgment be entered in conformity with this opinion.

All concur.